No. 46,546

Myrtle M. Barnes, *Appellee,* v. St. Francis Hospital and School of Nursing, Inc., *Appellant.*

(507 P. 2d 288)

Opinion filed March 3, 1973.

*Richard A. Loyd,* of the firm of Jochems, Sargent & Blaes, of Wichita, argued the cause, and *Robert L. Heath,* of the same firm, was with him on the brief for the appellant.

*Terry O'Keefe,* of the firm of Kidwell, O'Keefe & Williamson, of Wichita, argued the cause, and *Walter C. Williamson,* of the same firm, was with him on the brief for the appellee.

The opinion of the court was delivered by

FONTRON, J.: The defendant, St. Francis Hospital and School of Nursing, Inc., has appealed from a $22,500 judgment rendered against it for personal injuries sustained by the plaintiff, Myrtle M. Barnes, while a patient in the hospital. The parties will be referred to as plaintiff or Mrs. Barnes, on the one side, and defendant or hospital, on the other.

On October 27, 1967, plaintiff was admitted to the St. Francis Hospital by her attending physician, Dr. Milbank, for a hemorrhoidectomy. She was operated the next day. Following surgery she devolped a hard, sore, indurated area in the left buttock, which was medically diagnosed as fat necrosis. She was dismissed from the hospital November 6, and returned to the emergency room the next day where an incision was made under local anesthesia. On November 9, Mrs. Barnes was readmitted to the hospital and conservative treatment was administered. She was discharged and

returned home November 28. Mrs. Barnes was again readmitted to the hospital on December 8. This time surgery was performed and plaintiff remained hospitalized until January 2, 1968.

Several points are raised on appeal. The first three relate to the trial court's failure to sustain motions for directed verdict in defendant's favor, while the fourth concerns the denial of a motion for judgment notwithstanding the verdict. In effect, these points raise a central question for us to determine: Is there substantial competent evidence to support the verdict? We address ourselves to this point.

Plaintiff's evidence tends to show that the fat necrosis, which we understand denotes the death of fatty tissue, was caused by an injection of dramamine (a drug for control of nausea) administered subcutaneously in the area of the left hip; that the correct way to administer the drug hypodermically is to inject it into the muscle, i. e., by intramuscular injection, where the absorption is better; that dramamine cannot safely be injected into the subcutaneous tissue, since it is an irritating substance and will cause the tissues to die; and that the injection of the drug subcutaneously is not good nursing procedure and falls below the degree of care and skill employed by hospitals generally in Wichita or similar communities.

In defense of the plaintiff's charges of negligent and unskillful care, the defendant contends that the nurse who administered the dramamine injection was simply carrying out an order improperly given by Mrs. Barnes' treating physician. Hence, the hospital maintains it cannot be held liable for damages unless negligence be established in giving the injection, or unless it be shown that the doctor's order was so obviously improper as would cause it or its employees to anticipate injury.

The doctor's order, placed over the phone, was for dramamine to be given hypodermically. The evidence reflects that "hypodermically" means either subcutaneously or intramuscularly; that nurses are familiar with how different drugs are administered, and that nursing judgment has to be used in determining whether an injection should be given subcutaneously or intramuscularly where it has not been spelled out. Various nurses employed at the defendant hospital testified that dramamine, if given by needle, is to be administered deep, that is, intramuscularly; that it cannot be given subcutaneously because it is irritating; and that the doctor's order was given in the ordinary way, where the drug is as well

known as dramamine. Indeed, we learn from the notes of the nurse who gave the injection that she charted it as having been given IM (intramuscularly).

We believe there is abundant evidence to establish knowledge on the part of the nursing staff that dramamine, if administered hypodermically, rather than orally, must be given intramuscularly, even though the doctor's order may not be specific on this point. There is also evidence from which a reasonable inference may be drawn that the needle used in giving the injection was not long enough to reach the gluteus muscle, Mrs. Barnes being a woman of considerable girth and fleshy withal.

In view of the testimony as we have it summarized from the record we are forced to conclude there was sufficient evidence to take the case to the jury and to support the jury's verdict. Accordingly, under familiar principles, the verdict cannot be disturbed on appeal in the absence of other error. (See cases in 1 Hatcher's Kansas Digest [Rev. Ed.], Appeal & Error, § 495.)

It is next argued that Dr. Taylor, who testified on behalf of Mrs. Barnes as an expert witness, was not competent to testify as to the standards of care and skill required of hospitals in communities such as Wichita. In a recent case, *Avey v. St. Francis Hospital & School of Nursing*, 201 Kan. 687, 442 P. 2d 1013, this court considered this very question in depth, and having done so clearly spelled out the rule which now obtains in this state:

"A witness, qualified as a medical expert, who claims knowledge of the degree of care and skill, used by hospitals generally in the community where an injury occurred and gives a reasonable explanation of how such knowledge was acquired, may testify such matters even though he had not practiced medicine in the particular community. (Syl. ¶ 1.)

"Pursuant to K. S. A. 60-419 and 60-456, the test of competency of an expert witness is whether he discloses sufficient knowledge to entitle his opinion to go to the jury. Where an expert witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury the question of degree of his knowledge goes more to the weight of the evidence than to admissibility. (Following *Casey v. Phillips Pipeline Co.*, 199 Kan. 538, 431 P. 2d 518.)" (Syl. ¶ 2.)

Dr. Taylor's qualifications appear to bring him within the framework fashioned by the *Avey* decision. He is a doctor, a graduate of Indiana University Medical School, and has practiced medicine in Indiana and Arizona. He is an assistant professor of anesthesiology at the Kansas University Medical Center, with which he has been connected since 1968. Dr. Taylor testified that he had seen the

Nursing Procedure Manual and the Nurse Service Policy Manual of St. Francis Hospital, with particular reference to techniques for injection; that he was familiar with the proper method of giving injections, whether hypodermic or intramuscular; that he was familiar with the proper way of giving injections of dramamine in Wichita and has read manuals with respect to the way persons are educated to administer injections in Wichita; that the technique of giving injections, either subcutaneous or intramuscular, is pretty much the same whether given in Wichita, Kansas City or wherever you happen to be; that this is something which is basically taught in nursing school.

The fact that Dr. Taylor had never practiced medicine in Wichita does not disqualify him under the *Avey* rule, since it otherwise appears he is familiar with the degree of care and skill used generally by hospitals in that community. The qualifications of a witness to testify as an expert on a particular subject are ordinarily for the trial court to determine in the exercise of its sound judicial discretion. (*Avey v. St. Francis Hospital & School of Nursing*, supra; *Howard v. Stoughton*, 199 Kan. 787, 433 P. 2d 567.) We discern no abuse of that discretion here. The weight to be given Dr. Taylor's testimony was a matter for the jury to decide and in determining that question, the jury was entitled to consider the degree, the depth and the sources of his knowledge in those areas about which he testified. (*Avey v. St. Francis Hospital & School of Nursing*, supra; *Casey v. Phillips Pipeline Co.*, 199 Kan. 538, 549, 431 P. 2d 518.)

Objection is next directed to the hypothetical question propounded to Dr. Taylor as to the cause of the fat necrosis suffered by Mrs. Barnes. The defendant first says the question was too long, was poorly constructed and was confusing. To an extent this may be true, but Dr. Taylor apparently had no difficulty in comprehending and understanding the question, nor do we believe the jury could have been misled or bamboozled thereby.

The principal basis of the defendant's complaint against the hypothetical question centers on plaintiff's failure to incorporate therein any reference to the order for dramamine given by Mrs. Barnes' doctor over the phone. This ground of objection was not raised at the trial. Rather, an entirely different ground of objection was advanced. Hence, review is barred by the contemporaneous objection rule which requires that timely and specific objection be

made before the admissibility of evidence will be considered on appeal. (*State v. Freeman,* 195 Kan. 561, 564, 408 P. 2d 612, and authorities cited therein; see, also, K. S. A. 60-404 which codifies the rule.) Our decisions are to the effect that where, at the trial, an objection is made to the admission of testimony on a ground held to be insufficient, this court on appeal will not consider another or different ground for such objection. (*Botkin v. Livingston,* 16 Kan. 39, 41; *State v. Coover,* 69 Kan. 382, 384, 76 Pac. 845; *Edmondson v. Beals,* 27 Kan. 656.)

Furthermore, we fail to comprehend what relevance the doctor's order might have had to the hypothetical question propounded, in view of the way the question was framed. The question called for Dr. Taylor's opinion only as to causation, *i. e.,* what caused the fatty necrotic condition. In response to this query, Dr. Taylor testified that the condition was caused by a subcutaneous injection of dramamine into the left hip area. It appears to us that what the doctor may have said in ordering the injection would not be material in establishing the cause of the necrosis.

We reach defendant's seventh specification of error. The background is as follows: Prior to trial the plaintiff deposed Dr. Reals, a witness listed by the defendant. During the course of his examination the doctor was asked as to the cause of Mrs. Barnes' necrosis (which he termed fortuitous) and the basis on which his opinion was formed. At that time, Dr. Reals said he had reviewed the hospital admission report, the nurses reports and notes, photographs and all the charts. When testifying at the trial, the doctor related he had also examined some microscopic slides prepared from tissue specimens and was asked to testify about them. The slides themselves were not offered in evidence. The plaintiff objected vehemently, claiming surprise and lack of opportunity to cross-examine Dr. Reals from the slides.

After lengthy argument the trial court sustained the plaintiff's objection, and this ruling is assigned as error. The taking of pretrial depositions is part of the discovery process authorized by the code of civil procedure. (K. S. A. 1972 Supp. 60-226.) It is not presumptuous to assume that among the purposes to be served by discovery procedures is that of finding out what an adversary's witness may know concerning matters in controversy and what his testimony will probably be, thus eliminating, so far as possible, the element of surprise.

We cannot fault the court in its ruling. In view of the provisions of K. S. A. 1972 Supp. 60-226 (*e*) we believe that Dr. Reals should seasonably have amended his deposition by disclosing that he had examined the pathological slides in forming his opinion, in addition to the documents mentioned in his deposition. Since no seasonable disclosure was made, it is our opinion that the trial court did not exceed the bounds of sound judicial discretion in excluding the doctor's testimony concerning the slides. (See discussion in 8 Federal Practice and Procedure, Wright & Miller, §§ 2049, 2050.)

In any event we doubt that reversible error was committed in this respect. It is conceded that Dr. Real's opinion was not altered by his examination of the slides and it is difficult to understand how the defendant's case was substantially prejudiced by the trial court's ruling.

Finally the defendant argues that the verdict is so excessive as to require either a reversal or a remittitur of the excessive amount—although no specific figure is suggested.

Our rule on remittiturs may be expressed in this way: Where a verdict is so excessive and out of proportion to the damages actually sustained as to shock the conscience of the court, and the verdict has been approved and judgment entered thereon, and where no passion or prejudice has been shown other than the size of the verdict itself, this court may, on appropriate occasions, tentatively affirm the judgment on condition that the plaintiff accept a judgment in a somewhat lesser amount, reserving the right to reverse the judgment in case the plaintiff does not accept the smaller sum. (*Dobson v. Baxter Chat Co.*, 148 Kan. 750, 759, 85 P. 2d 1.) In *Slocum v. Kansas Power & Light Co.*, 190 Kan. 747, 749, 378 P. 2d 51, one of our later cases on the subject, we said this court would not require the plaintiff to accept a remittitur or else grant a new trial unless, under the facts of the particular case, the judgment was so large that it could not in reason be allowed to stand.

In examining the record in this case, we find that Mrs. Barnes, who was 48 years old at the time of trial, returned to the hospital twice after her operation because of the necrotic condition of her hip, spending 20 days the first time and 25 days the second, for a total of 45 days, and that she underwent an operation to her hip on the second visit. The brief filed by plaintiff reflects that she incurred medical and hospital expenses of more than $2040. There is evidence that plaintiff suffered a good deal of pain during her

travail; that the wound was extremely painful and offensively odoriferous, exuding odors likened to spoiled meat or dead rats. Mrs. Barnes testified she began having back trouble after the second operation and that the scar on her hip still troubles her when there is a change in the weather. Dr. Lichtor, who specializes in orthopedic surgery, testified that the events relating to plaintiff's hospitalization for fat necrosis aggravated her preexisting spondylolisthesis, and his prognosis was that she would have recurring back pain and might require surgery.

Under the circumstances we are unable to say the verdict is shocking to the conscience or wholly beyond reason. Much of the evidence going to damage related to intangibles, to the obnoxious and distressing character of plaintiff's wound, and to pain and sufferring, past, present and future. These are elements difficult to assess in terms of dollars. This court has said that pain and suffering have no known dimensions, mathematical or financial. (*Domann v. Pence*, 183 Kan. 135, 141, 325 P. 2d 321; *Slade v. City Cabs, Inc.*, 193 Kan. 105, 109, 392 P. 2d 127; *Langley v. Byron Stout Pontiac, Inc.*, 208 Kan. 199, 202, 491 P. 2d 891.) While the judgment is generous we cannot brand it unconscionable.

We find no reversible error in this case and the judgment of the court below is affirmed.